UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
THOMAS CHARLES STEMMLE, JR.,

                      Plaintiff,            **MEMORANDUM AND ORDER**

      -against-                       CV 15-4937 (AYS)

INTERLAKE STEAMSHIP CO.,

                      Defendant.
-------------------------------------------------------------X
**SHIELDS, Magistrate Judge:**

This admiralty case was commenced in December of 2014 by Plaintiff Charles Stemmle ("Plaintiff" or "Stemmle") against Defendant Interlake Steamship Company ("Interlake" or "Defendant") in New York State Court. After the filing of an amended complaint on April 29, 2015, the case was removed to this Court. Docket Entry herein ("DE") [1]. A motion to remand was denied on July 27, 2016. During an initial conference held before this Court on September 27, 2016, the parties advised that they wished to pursue an early settlement. A settlement conference was thereafter held on January 29, 2017. After extensive negotiation, the parties agreed to a settlement. They also agreed to consent to the exercise of full jurisdiction by this Court, and this Court agreed to exercise such jurisdiction after settlement was reached.

Among other terms, the parties' settlement provides for Defendant to make premium payments for a policy of health insurance supplemental to Plaintiff's Medicare coverage. Defendant agreed to continue to make premium payments until Stemmle reached maximum medical cure, as that term is defined under admiralty law. It was agreed that this Court would determine when such cure was achieved.

Presently before this Court is Defendant's motion pursuant to Rule 9(h) of the Federal Rules of Civil Procedure, and 28 U.S.C. §2201(a) for an order declaring that Plaintiff has

reached maximum medical cure. For the reasons set forth below, the Court holds that Stemmle has reached maximum medical cure. Accordingly, Defendant's motion is granted.

<u>BACKGROUND</u>

I.    <u>Plaintiff's Claims and the Parties' Pursuit of Early Settlement</u>

Plaintiff's claims arise out of cardiac illness that he suffered while working as a seaman aboard Defendant's commercial ship. Because the illness was experienced by Plaintiff while working on board Defendant's vessel, Stemmle sought maintenance and cure pursuant to the admiralty law of the United States. While Defendant opposed Plaintiff's claims, it shared Plaintiff's desire to place this matter into an early settlement posture. Accordingly, counsel and their clients (including Plaintiff's wife) appeared before this Court on January 9, 2017 to engage in settlement negotiations. It became clear that early settlement was sought because of the dire nature of Plaintiff's heart condition. In particular, Plaintiff represented that the only cardiac treatment option then available to him was a heart transplant. At the time, Plaintiff was seeking to be placed on a heart transplant waiting list for surgery to be performed at Cedars-Sinai Hospital in the State of California ("Cedars-Sinai"). Cedars-Sinai was represented as the place where Plaintiff had the best and earliest chance of receiving a new heart because, as Plaintiff explained, California is an "opt-out" State where individuals opt-out of being organ donors, as opposed to the State of New York, where individuals who agree to be organ donors agree to opt-in to a donation program.

As a result of their discussions and negotiations, the parties worked together and agreed to settlement of this action. Their agreement is memorialized in a final written settlement agreement, which is discussed in further detail below. <u>See</u> Settlement Agreement and General Release annexed as Exhibit J-1 to the Declaration of Gino Zonghetti (the "Zonghetti Decl.") DE

[65-13] (the "Agreement"). Pursuant to the Agreement, this Court has exercised continuing jurisdiction over the parties' disputes, and now, as to the final disposition of this matter. This latest matter is sought by way of the motion presently before the Court. See DE [65-13] at ¶ 4. Before turning to the merits of the motion, the Court turns to a discussion of the facts that are relevant to the disposition of the motion.

FACTS

I.    Relevant Portions of the Agreement

    A.    Insurance Payments Under the Agreement

The Agreement recognizes that because of his then-disabling heart condition Stemmle qualified for Medicare as his primary insurance coverage. DE [65-13] at ¶1. Maintenance of a secondary insurance policy was a condition of Plaintiff's acceptance to the Cedars-Sinai transplant program. See DE [65-13] at ¶ 5(B)(i). The Agreement facilitates this condition of the program by providing for Defendant to pay for a then-existing secondary health insurance policy issued by Humana (the "Secondary Policy"). DE [65-13] at ¶1.[1] Defendant began payment of premiums for the Secondary Policy in February of 2017. Under the terms of the Agreement, premium payments for this policy are to continue until Defendant's obligations "under the doctrine of Maintenance and Cure are ruled by [the Court] to have been met in full, as determined pursuant to the terms set forth in paragraph 5" of the Agreement. Maintenance and cure obligations to Plaintiff were being paid for the condition suffered by Plaintiff while working on board Defendant's vessel. This condition is described in the Agreement as "systolic heart

---

[1]    The Agreement also provides for the payment of certain relocation expenses and a post-transplant monthly stipend. See DE [65-13] at ¶ 6. Those payments have ceased, and they are not the subject of this motion. Accordingly, they are not discussed herein. For a discussion of those payments, the reader is referred to the decision of this Court dated November 12, 2019. DE [48].

3

failure and any related or resulting cardiac conditions". DE [65-1]3 at ¶1. The Agreement recognized that Plaintiff's medical condition was "not curable, based upon the advices received from Cedars-Sinai." DE [65-13] at ¶1. The Agreement provides for Defendant to continue to make premium payments for the Secondary Policy (or any successor policy in the event that policy is no longer in effect) until this Court's legal determination that Stemmle has reached "Maximum Medical Cure," or, as interchangeably used by the parties (and in the case law) "Maximum Medical Intervention" DE [65-13] at ¶1A. The Court refers herein more simply to this concept as "MMI."

B.    Recognition of Plaintiff's Post-Transplant Regimen and
      The Parties' Intent as to the Court's Interpretation of MMI

The issue of whether MMI has been met was agreed, like all other questions, to be subject to final decision by this Court. See DE [65-13] at ¶ 5. Relevant to that decision, the Agreement makes reference to Stemmle's formal acceptance into the Cedars-Sinai heart transplant program, and the post-transplant care necessary for all transplant patients. DE [65-13] at ¶ 5(B)(i). In particular, the Agreement states that following surgery, Stemmle will "require the use [of] anti-rejection medication, perhaps for the rest of his life." DE [65-13] at ¶ 5(B)(ii). The Agreement also states that following transplant surgery Stemmle "will be required to undergo periodic examinations by physicians, including cardiologists, to check on his post-transplant progress, overall health, status of anti-rejection medications, and other necessary treatments typically required for heart transplant patients." DE [65-13] at ¶ 5(B)(iii).

As to Stemmle's recovery, the Agreement states the parties' intent that Stemmle's heart condition shall be evaluated under maritime law developed with respect to the obligations of a shipowner to a seaman "afflicted with an incurable disease, permanent condition or chronic illness which manifests itself during the seaman's employment aboard a vessel, but is not caused

4

by it." DE [65-13] at ¶ 5(B)(iv). After referring to the cessation of payments pursuant MMI, the Agreement states that Stemmle's needs for post-transplant evaluation and monitoring, including "necessary treatments typically required for heart transplant patients," and the "on-going need for anti-rejection medication", standing alone, *shall not be determinative* of the issue of whether Stemmle has reached Maximum Medical Cure." DE [65-13] at ¶ 5(B)(iv) (emphasis added).

II.    Plaintiff's Current Medical Condition

The facts regarding Plaintiff's medical treatment and current condition are drawn from the medical opinions discussed below, as well as Plaintiff's testimony - both at deposition and in the form of an affirmation submitted in reply to the present motion. The Court begins with Plaintiff's point of view. Next, the Court discusses the medical facts as described by the parties' expert opinions.

A.    Plaintiff's Testimony

Stemmle testified as to his current health condition and employment during his recent deposition, which was taken on March 16, 2022. See Transcript of Deposition of Thomas Stemmle annexed as Exhibit M to the Zonghetti Decl. ("Stemmle Tr."), DE [65-16]. Plaintiff has supplemented his testimony by way of an affidavit dated May 9, 2022, which was submitted in reply to the present motion. See Affidavit of Thomas Stemmle dated May 9, 2022, annexed as Exhibit B to the Herd Decl. ("Stemmle Reply Aff."). DE [66-3].

Plaintiff is currently thirty-six years old. His heart transplant surgery took place on December 9 and 10 of 2019 at Cedars-Sinai. A two- and one-half-week period of hospitalization immediately followed the surgery. Plaintiff thereafter resided in a Los Angeles apartment for a period of two months. He then moved to Las Vegas, Nevada where he currently resides. After relocating to Nevada, Plaintiff periodically returned to Cedars-Sinai (in Los Angeles) for follow-

up visits. Because of the Covid-19 pandemic, Plaintiff has also followed up with his California-based medical team via virtual visits. Stemmle Tr. at 7-8. He testified that all treating medical professionals treating him characterize the surgery as a success. See id. at 9.

Since surgery, Plaintiff has been on anti-rejection and immunologic suppressive therapies. Stemmle Tr. At 10. He states that he will remain on these therapies for life so that his body does not reject the transplanted heart. Stemmle Tr. at 10; 18-19. At the time of his deposition, Plaintiff was taking approximately six different medications, twice a day. Stemmle Tr. at 30. Those medications can change, depending on Plaintiff's bloodwork. Stemmle Tr. at 31. Plaintiff generally remembers to take his medicine, except for when he suffers from what he describes as "brain-fog"- which Plaintiff describes as experiencing after his transplant. Stemmle Tr. at 32-33. Plaintiff is not currently receiving any treatment for this described condition. Stemmle Tr. at 46. He also reports cyclical fatigue following his transplant. Stemmle Tr. at 34. While Plaintiff has not been hospitalized since his transplant, Stemmle Tr. at 9, it is his view that he requires life-long care at Cedars-Sinai. Stemmle Tr. at 9; 25; 41. Plaintiff is unaware of any treatment that will improve his current physical condition. Stemmle Tr. at 18; 26. He believes that his current heart is expected to last between twenty and twenty-five years. Stemmle Tr. at 43. As Stemmle is currently thirty-six years old, he expects that at some time in the future he will need a new heart. Stemmle Tr. at 44.

Since his transplant, and over the year preceding his 2022 deposition, Plaintiff has experienced an increase in stamina, and a decrease in fatigue. Stemmle Tr. at 35. He states that his doctors cannot predict how long it will be before he reaches his full potential stamina, but that his strength has been improving each month since the transplant. Stemmle Reply Aff. ¶ 4. When home, Plaintiff works on trucks, walks his dog, and does some gardening. Stemmle Tr. at

6

11-2; 48. He characterizes himself as getting towards a "normal lifestyle." Stemmle Tr. at 17. At Plaintiff's deposition, Defendants showed him a video which was posted to Plaintiff's Instagram account. That video, posted on March 11, 2020 (three months after his transplant, and two years before the deposition) shows Plaintiff standing on the roof of his house using a saw to cut tree branches that were hanging over the roof. This activity was not prompted by any emergency, but was described by Plaintiff as maintenance to prevent the branches from hitting roof tiles. Plaintiff climbed a ladder to reach the roof to perform this maintenance. Stemmle Tr. at 49. He testified that he was able to perform such home maintenance activities on good days, but not on bad ones. Stemmle Tr. at 49-50; see also Stemmle Reply Aff. ¶ 8 (noting that on the day that his parents took the video Plaintiff was having a good day).

Plaintiff's Reply Affirmation acknowledges the success of his heart transplant, but characterizes his post-transplant recovery as "far from perfect." Stemmle Reply Aff. ¶ 3. He states that as a result of his surgery and his immunosuppressant medication he suffers from leg numbness, nerve damage, shingles flare-ups and "susceptibility to other ailments/diseases." Id. He further states that his physicians have informed him that "it is statistically certain" that he will develop cancer at some point due to [his] heart transplant and the medications that [he] must take." Id.

Plaintiff has been employed as an engineer at the Cosmopolitan Hotel and Casino in Las Vegas since December of 2020, approximately one year after his transplant. Stemmle Tr. at 11. He explains that while he was not fully ready to return to work at that time, he sought employment because the stipend provided for in the Settlement Agreement was terminated. Stemmle Reply Aff. ¶ 9. Plaintiff drives to work and requires no special accommodation, although he is able to ask for help if necessary. Stemmle Tr. at 12; 47; Stemmle Reply Aff. ¶ 9.

He currently works full time as a facilities engineer doing mostly plumbing and electrical work. Stemmle Tr. at 12. In his reply affirmation, Stemmle states that as a result of his fatigue, he has had to call in sick. He states that because of the high number of such sick days, he is at risk of losing his job. Stemmle Reply Aff. ¶ 9.

Although it is available to him, Plaintiff does not currently receive health care benefits from his employer. Stemmle Tr. at 54. Instead, his health care expenses - including his anti-rejection medications - are covered by Medicare and the Secondary Policy. Stemmle Tr. at 57-58. Currently, if Plaintiff's earnings exceed a certain annual amount set by the government (which Plaintiff believes to be $18,000) he would not be considered disabled, and would therefore no longer be eligible for Medicare benefits. Stemmle Tr. at 55; 57-58. At the time of his deposition, Plaintiff was not aware whether any employer-provided health insurance would cover the cost of his medications to the same extent as the coverage currently provided by Medicare in conjunction with the Secondary Policy. Stemmle Tr. at 54-56; 61-62. Defendant's reply papers make reference to the fact that Plaintiff has currently refused health insurance provided by his employer and that, if the Secondary Policy is discontinued, Plaintiff can avail himself of this employer-provided benefit. The Court makes clear that the availability of alternate insurance is neither relevant nor dispositive of the question of whether Plaintiff has achieved MMI. Therefore, it does not rely on facts with respect to the availability of such insurance in reaching its decision. It mentions them only to make clear that a finding of MMI will not result in discontinuance of the availability of either anti-rejection medication or follow-up check-up appointments.

    B.    <u>Medical Opinions Regarding Plaintiff's Cardiac Care and Follow-up Treatment</u>

        1.    <u>Dr. Kransdorf</u>

Dr. Evan Kransdorf ("Kransdorf") is a physician at Cedars-Sinai who treats Plaintiff. Plaintiff testified as to his treatment with Kransdorf and the transplant team. Plaintiff testifies that Kransdorf's treatment plan consists of long-term surveillance, blood draws, medication management and clinical visits with the transplant team. Stemmle Tr. at 21. Visits with the transplant team were initially scheduled to take place every three months during the two-year period following the transplant. Those visits are now complete. Stemmle Tr. at 21. Following that two-year period Plaintiff stated that he was to be seen twice a year, or more frequently depending on his status. Stemmle Tr. at 22. Certain treatments are to be performed on an annual basis for a six-year period following the transplant. Those treatments are described by Kransdorf as consisting of nuclear stress tests, angiograms, medication monitoring and overall well-being assessments. Stemmle Tr. at 23.

Kransdorf has submitted a report regarding Plaintiff's plan of care. Letter dated September 20, 2021 annexed as Exhibit N to Zonghetti Decl. (the "Kransdorf Report"), DE [65-17]. The Kransdorf Report notes that Plaintiff underwent heart transplant surgery on December 9, 2019 at Cedars-Sinai. Kransdorf's description of Plaintiff's treatment plan for Stemmle is consistent with Plaintiff's testimony. Thus, Kransdorf states that his current treatment plan consists of "lifelong surveillance procedures (angiograms and nuclear stress tests), blood draws, medication management and clinic visits with [the] transplant team." Kransdorf Report. As Plaintiff is now more than two years out of surgery, his visits with the team for the six year post-transplant period will be take place at least twice a year. Those visits will include an echocardiogram with chest X-ray and possible angiogram for cardiac vasculopathy or organ rejection. In addition to in-person visits, Kransdorf plans to visit with Plaintiff virtually every six months as needed.

Kransdorf states that Plaintiff will need this follow-up care for the rest of his life. Failure to follow, at a minimum, the maintenance procedures described above will lead to an increased risk for organ rejection and a decline in health. Indeed, it is Kransdorf's opinion that if Plaintiff does not receive the care he describes, Plaintiff's health would likely decline to the point where he could be in advanced heart failure or die.

 2.  Dr. Lima

The report of Dr. Brian Lima, M.D. a cardio-thoracic surgeon with Advance Cardio-thoracic Surgeons of Dallas, Texas, is before the Court. See Report dated March 14, 2022, annexed as Exhibit O to the Zonghetti (the "Lima Report"), DE [65-18]. The Lima Report describes the plan of care for patients who, like Plaintiff, have received a heart transplant. That protocol is consistent with the plan of care described by Plaintiff, and set forth in the Kransdorf Report. Thus, the Lima Report notes that any heart transplant recipient will require regularly scheduled surveillance. Similarly, a lifelong course of immunosuppressive medications is stated to be vital to preventing organ rejection. Careful titration of such drugs is also required. The Lima Report sets forth a schedule for rejection therapy monitoring, which, at this point in Plaintiff's care, requires annual heart biopsy visits. In the event a patient suffers an episode of rejection, the biopsy is to be clinically documented and treated as needed. Clinical visits are scheduled to follow the same regimen. Additionally, annual visits are to include routine blood work, diagnostic testing, cancer screening, heart catheterization and evaluation for transplant coronary artery disease. Like the Kransdorf Report, the Lima Report stresses the importance of lifelong clinical surveillance. As stated by Dr. Lima, failure to adhere to such a policy of could have disastrous, likely fatal results.

 3.  Dr. Rich

Defendant engaged the services of expert heart failure and transplant physician Dr.
Jonathan D. Rich ("Dr. Rich"). Dr. Rich's report is annexed as Exhibit P to the Zonghetti Report
(the "Rich Report"), DE [65-19]. Dr. Rich bases his opinions on his experience in the field of
heart transplants as well as his review of Plaintiff's medical records pertaining to the post-
transplant care that Plaintiff received at Cedars-Sinai, and Plaintiff's deposition testimony. The
Rich Report summarizes Plaintiff's medical history with respect to the cardiomyopathy that
preceded his heart transplant. Rich Report at 5-6. It also chronicles the post-surgical follow-up
care received by Plaintiff at Cedars-Sinai. Dr. Rich notes that the records provided to him up
until the date of his report (records through January of 2022), reveal that Plaintiff has suffered no
post-transplant complications, including no evidence of cardiac rejection, no hospitalizations and
"no documented clinical concerns by [Plaintiff's] heart transplant team at Cedars-Sinai." Rich
Report at 7-8.

Dr. Rich states his opinion that Stemmle has "thrived following his heart transplant and
should be expected to have a long-term outcome at least as favorable to those who also do well
during the first year following heart transplantations". Rich Report at 8. Dr. Rich agrees with
Drs. Kransdorf and Lima as to the need for life long periodic assessments, but also notes that if
Stemmle adheres to the required schedule for such assessments the risk of serious complication
or death is "overall low." Rich Report at 8.

Dr. Rich opines as to the typicality of guidelines regarding post-transplant care. As to this
part of his opinion, Dr. Rich relies on a database of the International Society for Heart and Lung
Transplantations (the "ISHLT") which includes data from over 140,000 cardiac transplants since
1982, performed in connection with more than 470 transplant programs. Rich Report at 8. The
frequency of follow-up care during the first year following the transplant is tied to the possibility

of complications during this period of time. This close monitoring reflects the importance and safety of this approach and the long-term success of those entering the second year of life following their transplant. Approximately 85-90% of transplant patients who survive this initial period survive five years post-transplant.

In addition to close monitoring, Dr. Rich also agrees with Drs. Kransdorf and Lima as to a transplant recipient's life-long need for anti-rejection medications, along with periodic dose adjustments based upon blood levels. Rich Report at 9. Where such a medication regimen is adhered, to the risk of rejection is "as low as 1.9 percent from 5-10 years, 0.9 percent from 10 to 15 years and 0.5 percent after 15 years." Rich Report at 9. Dr. Rich refers also to emerging technologies that use gene expression profiling to limit the number of surveillance biopsies, even for patients earlier in the post-transplant process than Stemmle.

As discussed above, Dr. Rich agrees with Drs. Kransdorf and Lima with respect to the schedules for post-transplant medication and monitoring. In his report. Dr. Rich states expressly that he "agree[s] with Dr. Kransdorf that Mr. Stemmle has progressed into the 'maintenance' phase following heart transplantation and as such should be able to enjoy an excellent quality of life with excellent short and immediate term survival. In fact, the transplant team at Cedars-Sinai appears to be continuing to follow" this exact protocol as set forth by Dr. Rich. Rich Report at 10. While the Rich Report refers to what appears to be more recent protocol advancements such as gene expression profiling and/or cell-free DNA testing, Rich agrees with, and finds no fault with Dr. Lima's opinions regarding post-transplant protocols for testing. See Rich Report at 10 (referring to Dr. Lima's testing protocol as "slightly outdated or more conservative" but not disagreeing with the propriety of that protocol).

The Rich Report concludes by describing Stemmle's current condition as that of "an otherwise 'healthy' patient with diabetes mellitus." Rich Report at 11.  Both such patients require lifelong medication, office visits, periodic assessments of their glycemic control [sugar levels], routine surveillance of their eyes by an ophthalmologist, feet by a podiatrist, and remain at a slightly higher risk for other future complications (i.e., coronary artery disease) as compared to an otherwise healthy non-diabetic individual. Like diabetics, post-heart transplant patients who, like Stemmle, have done well, should be expected to continue on that path by adhering to their medication regimen, and following their team's surveillance protocols. Rich Report at 11. Dr. Rich further states that by all clinical accounts Stemmle "appears to have done as well as could be possibly expected following his 2019 transplant". Rich Report at 10-11. Relying on Stemmle's deposition testimony, Rich notes that Plaintiff is gainfully employed, travels twice a year between Las Vegas and California for routine check-ups "and should be expected to continue to enjoy an excellent quality (and quantity) of life for many years to follow." Rich Report at 12.

While recognizing that the terms "cure" and curative" may have particular legal definitions, Dr. Rich states his opinion that the only medical treatment that was potentially curative of Stemmle's pre-transplant medical conditions (cardiomyopathy and congestive heart failure) was the heart transplant that was successfully performed in 2019. Rich Report at 12. Stemmle is described as having successfully recovered from that surgery "and there is no further medical treatment that could be described as curative in nature that is available to him. In turn his present condition would be described as incurable." Rich Report at 12. Dr. Rich describes Stemmle's current cardiac condition as permanent. The only exception to this opinion would be "the remote possibility" in the "distant future", should the need arise for repeat heart

13

transplantation. Such a procedure is uncommon because heart transplant patients are usually deemed ineligible for re-transplantation for a variety of reasons. Rich Report at 12. Dr. Rich concludes that the treatments available for Plaintiff going forward are best described as maintenance of Stemmle's current condition, "but not curative in nature." Rich Report at 12.

        4.     Life Care Plan Expert

Plaintiff submits the expert opinion of Aaron M. Woodson, Ph. D. ("Dr. Wolfson"). Dr. Wolfson reviewed Plaintiff's medical records and met with Stemmle to prepare a life care plan assessment, reflected in his report annexed as Exhibit D to the Herd Decl. (the "Wolfson Report"), DE [66-5].  The Wolfson Report is expressly noted to be preliminary only, pending consultation with Plaintiff's treating physicians, which had not taken place as of the date of the report. Wolfson Report at 1. The Wolfson Report does not opine as to the necessity of future medical care for Stemmle. Nor does it take a position as to the conclusions reached by any of the physicians referred to above with respect to the curative nature of Plaintiff's transplant. It merely calculates the expenses of currently prescribed follow-up care and medications based upon a life expectancy of a thirty-six-year-old man - which is expected to be an additional 42.4 years. Dr. Wolfson notes that this life expectancy calculation could change upon additional medical input from treating physicians, which as noted, had not taken place as of the date of the Wolfson Report.

Not only is the Wolfson Report preliminary in nature, it does not address the issue of MMI. Accordingly, while the Wolfson Report is relied on by Plaintiff and described herein, it is not relied upon by the Court is making its decision with respect to MMI.

IV.    The Present Motion

Defendant has complied with the terms of the Settlement Agreement. Thus, it has made premium payments on the Secondary Policy that was a prerequisite for Plaintiff's acceptance into the Cedars-Sinai program. Since Plaintiff's December 2019 successful heart transplant, Defendant has provided the health insurance coverage (secondary to Medicare) that allows for full payment of the follow-up medical services provided by Cedars-Sinai, whether in-person or via virtual visits. In conjunction with Medicare, the Secondary Policy also has covered the costs of Plaintiff's anti-rejection medication.

Defendant's motion seeks a declaratory judgment that its obligation under the Settlement Agreement, i.e., to maintain payments until Plaintiff achieves "maximum cure," (or as referred to herein MMI), has now been reached. The Court turns to discuss the admiralty standards that apply, and to determine the merits of the motion.

DISCUSSION

I.    Legal Standards: Maintenance and Cure

A seaman injured in the service of a ship is entitled to three district remedies—maintenance, cure, and wages. Messier v. Bouchard Transp., 688 F.3d 78, 81 (2d Cir. 2012). Neither wages nor maintenance payments are at issue here. "Cure" - which is at issue - is defined as "the reasonable medical expenses incurred in the treatment of the seaman's condition". Id. It refers to payments for all aspects of the seaman's medical care until he reaches maximum medical recovery. Vaughan v. Atkinson, 369 U.S. 531 (1962); Calmar S.S. Corp. v. Taylor, 303 U.S. 525, 528 (1938).

Maximum medical recovery is reached, inter alia, when "the incapacity is declared to be permanent." Vella v. Ford Motor Co., 421 U.S. 1, 5, 95 S. Ct. 1381, 43 L. Ed. 2d 682 (1975) (quotation marks omitted); see Marcic v. Reinsure Transp. Companies, 397 F.3d 120, 130 (2d

15

Cir. 2005); Adams v. Liberty Maritime Corp., 560 F. Supp. 3d 698, 715 (E.D.N.Y. 2020); McMillan v. Tug Jane Bouchard, 885 F. Supp. 452, 459 (E.D.N.Y. 1995) (maximum cure reached "when the seaman recovers from the injury, the condition permanently stabilizes or cannot be improved further"). Permanency and a consequent finding of maximum cure exists where the seaman's condition is "incurable." Haney v. Miller's Launch, Inc., 773 F. Supp. 2d 280, 290-91 (E.D.N.Y. 2010). Under such circumstances, "the shipowner has no further liability, whether or not the patient requires additional treatment to restrain degeneracy or relieve pain". Haney, 773 F. Supp. 2d at 290-91; see also Muruaga v. United States, 172 F.2d 318, 321 (2d Cir. 1949) (reversing a judgment for maintenance and cure to a victim of an incurable cardiovascular disease because treatment has provided "all the improvement to be expected in an incurable disease").

The Second Circuit has long recognized a distinction between treatments that effectuate further cure, and those that are aimed at preventing relapse. A seaman treating pursuant to the latter category of treatments may nonetheless have achieved maximum cure. See Lindgren v. Shepard S.S. Co., 108 F.2d 806, 807 (2d Cir. 1940) (reversing judgment for maintenance and cure since treatments to prevent relapse do not "effectuate further cure"); see Desmond v. United States, 217 F.2d 948, 950 (2d Cir. 1954). Notably, "[t]he obligation to provide maintenance and cure payments, does not furnish the seaman with a source of lifetime or long-term disability income." Messier, 688 F.3d at 81, quoting, Robert Force, Federal Judicial Center, Admiralty and Maritime Law 89 (2004); accord Norfolk Dredging Co v. Wiley, 450 F. Supp. 2d 620, 626 (E.D. Va. 2006) (maintenance and cure not intended to be a "pension or disability program").

The seaman bears the initial burden of persuasion to prove their right to maintenance and cure. Once established, the burden shifts to the shipowner to prove that the injured employee has

reached maximum cure. <u>McMillan</u>, 885 F. Supp. 2d at 459, 460; <u>see</u> <u>Carlsson v. United States</u>, 252 F.2d 352, 353 (2d Cir. 1958). When determining the scope of a shipowner's responsibilities, the Court must be guided by the principal that the duties of maintenance and cure "exist for the benefit of seaman." Accordingly, courts are instructed to be "liberal in interpreting this duty for the benefit and protection of seamen who are [the admiralty courts'] wards." <u>Messier</u>, 688 F.3d at 83, quoting, <u>Vaughan</u>, 369 U.S. at 531–32, 82 S. Ct. 997 (quotation marks omitted). "Any doubts or ambiguities relating to maintenance and cure must be resolved in favor of the seaman." <u>McMillan</u>. 885 F. Supp. 2d at 460. Given this expansive interpretation, it is not surprising that, a seaman who has previously achieved MMI may reinstitute a demand for maintenance and cure where new curative medical treatments become available. <u>Id.</u>

Finally, before turning to the merits of the motion the Court notes that its decision is guided by familiar standards of summary judgment. <u>Padilla v. Maersk Line, Ltd.</u>, 603 F. Supp. 2d 616. 622 (S.D.N.Y. 2009), <u>aff'd</u>, 721 F.3d 77 (2d Cir. 2013). Thus, if there is a question of fact as to the issue of MMI, the motion must be denied.

II.     <u>Disposition of the Motion</u>

At the outset, it is important to note that holding that Stemmle has reached MMI does not translate to a finding that he will no longer have access to anti-rejection medication or follow-up care. It will lead only to the conclusion that Plaintiff will have to obtain payment for his health care via a private or governmental insurer different from that supplied by the Secondary Policy. Stemmle has access to and takes his anti-rejection medicine. There is no question but that he follows up properly with his treating physicians. Plaintiff's recovery from surgery, and his current medical status are testament to the excellent care provided by Stemmle's Cedars-Sinai team, and Plaintiff's compliance with their plan of care.

As to the merits of the motion, Drs. Kransdorf, Lima and Rich are in agreement regarding the success of Stemmle's heart transplant, and the protocol for his post-transplant care. That protocol calls for a tiered schedule of follow-up clinical testing and medication management. Particularly important to Stemmle's health is the continuing regimen of well-monitored anti-rejection medication. No expert downplays the critical importance of such medication, and there is no indication that Stemmle has failed to comply with the schedule prescribed by his transplant and follow-up teams. While the defense expert has not used the exact same words as Plaintiff's experts, it is clear to the Court that failure to continue to take anti-rejection medication could lead to organ rejection and death.

In light of the agreement of expert opinion as to Plaintiff's care, the questions before the Court as to MMI are somewhat narrow. First, does the life-long requirement that Plaintiff remain on anti-rejection medication preclude a finding that Stemmle has achieved MMI?  Relatedly, has Plaintiff's ongoing post-transplant cardiac recovery and improvement (and the hope that he will continue on this trajectory) bar a holding that he has reached MMI? In terms of the admiralty standards discussed above, the question is whether Plaintiff's heart health is now stabilized to the point permanency that is reflective of MMI. The Court holds that neither the presumably life-long need for anti-rejection medication, nor Plaintiff's continuing improvement preclude holding that Stemmle, who is approaching the three-year post-transplant survival date, has achieved MMI. As discussed below, he has.

When considering whether Plaintiff has achieved MMI, the Court focuses not only on Plaintiff's improvement post-transplant, but on whether there is any available treatment (now that he has received a new heart) for the illness for which he first sought cure. All medical experts agree that the medical condition that plaintiff suffered while a seaman was that of

chronic heart failure. The only treatment available to Stemmle at the time that this lawsuit was filed, at the time of the Agreement, and to the present, was a heart transplant. Now that he has had a successful transplant, all medical experts agree that no additional medical intervention for Plaintiff's heart condition is available to Stemmle. While he has testified that he might need a new heart in twenty or twenty-five years, there is no expert medical testimony to that effect.

By all accounts, Stemmle's present medical condition is stable. All medical experts are in agreement as to Plaintiff's remarkable progress since his transplant. Plaintiff's testimony is in accord with their prognoses. He has progressed to the point where his check-ups are less frequent and less invasive. There is no question that anti-rejection medicine will always be a critical part of Plaintiff's care. Monitoring will avoid what all agree would be the disastrous result of organ rejection. Plaintiff's current monitoring is, however, now similar to a schedule of check-ups for individuals with a history of heart problems who are not candidates for additional curative measures. This case is therefore akin to those where the seaman has recovered from a chronic illness but needs to maintain a medication regimen to avoid relapse. The case law in this Circuit is clear that under the circumstances where a seaman is receiving only care to prevent relapse no further cure is available and MMI has been reached. See Lindgren, 108 F.2d at 807 (life-long examinations and treatments aimed at preventing relapse are not aimed at effectuating further cure); see also Desmond v. United States, 217 F.2d 948, 950 (2d Cir. 1954) (reaching same conclusion with respect to treatments to "restrain degeneracy or relieve pain"). Indeed, this case falls squarely within that category of cases. That is because Plaintiff's monitoring and medication management, while of unquestionably critical importance, constitute measures to prevent return to his pre-transplant cardiac condition. Such measures, without any accompaniment of further treatment, are indicative of having achieved MMI.

Like the need for medication, the positive trajectory of Plaintiff's progress does not prevent a finding that he has achieved MMI. There is no question as to Plaintiff's continuing improvement. It is well-evidenced by his employment and at-home activities. These facts are incontrovertible, as supported by Stemmle's deposition testimony, and the statements of his medical team. It is clear that Plaintiff's stamina continues to increase. He has been gainfully employed since 2020 on a full-time basis. His at-home actives include gardening and dog walking, as well as occasionally strenuous home maintenance. This improvement does not, as Plaintiff argues, mean that he continues to be in the cure phase of his treatment.

As the standards above make clear, the admiralty concept of "cure" is not dependent on a final medical finding that the seaman is no longer getting better. Instead, maximum "cure" is that point of care when there are no further medical treatments available to the seaman. Medical monitoring and the passage of time do not constitute curative measure that are the responsibility of the vessel owner. Thus, while Plaintiff's cardiac health continues to improve, this does not mean that there is additional "cure" available to him that precludes reaching MMI. When considered along with the opinions of his treating physicians, Plaintiff's employment and at-home activities are in accord with a finding of stabilization and permanence - the hallmarks of having achieved MMI. Plaintiff is not running any marathons, and the Court is not suggesting that all of his days are good ones. However, his employment and other physical activities demonstrate the stabilization of Plaintiff's medical condition to support a finding of MMI.

With respect to reaching stability and permanence, it is important to note that nearly three years have passed since Plaintiff's transplant. This distinguishes this case from any hypothetical cases where MMI is not reached either because of a precarious medical condition that precedes further major intervention (such as an organ transplant), or the health of a person who has had

more recent transplant surgery. If the present motion were interposed a week after the transplant, or even months thereafter, the Court's holding as to MMI might not be clear. MMI is equated with stability of the health condition for which a seaman seeks cure. Therefore, had this motion been brought before the Court immediately following the 2019 transplant, it might not have been able to characterize Plaintiff as having achieved the level of permanence and stability that is equated with MMI. For example, immediately following his transplant, the transplanted heart might have failed, and Plaintiff might have immediately required a new heart. Under those circumstances, MMI would not have been achieved. However, now that Plaintiff is almost three years post-transplant and is, by all accounts, doing remarkably well there is no question but that Plaintiff's condition has stabilized to the point where this Court can hold that he has achieved MMI within the meaning of admiralty law.

Plaintiff cites to Costa Crociere, S.p.A. V. Rose, 939 F. Supp. 1538 (S.D. Fla. 1996), in support of his claim that he has not reached MMI. Rose involved the case of a seaman in kidney failure. The court there agreed that life-sustaining dialysis treatments were part of the seaman's cure, and that their ongoing nature did not equate with a finding that he had reached MMI. See Rose, 939 F. Supp. at 1552. Rose is distinguishable, however, because in that case there was a further level of cure available to the seaman - that of a kidney transplant - which the seaman had not yet received. See id. Since this further treatment (an organ transplant) was still available to the seaman in Rose, the court held that he had not reached MMI. Like the seaman in Rose, all of Stemmle's pre-transplant treatments (including Plaintiff's Left Ventricular Assistive Device (the "LVAD")) were part of his road to reaching MMI. There is no question that, in accord with Rose, Plaintiff would not have been deemed to have reached MMI so long as a heart transplant was available to him. Now, having received a new heart, there is no further "cure" within the

meaning of admiralty law, that is available to Plaintiff. No expert disagrees. Instead, Plaintiff's treatment has reached the permanence phase. He continues to receive treatments and, indeed, those treatments are keeping him alive. However, they are aimed at preventing a relapse into heart failure. As in interpreted in this Circuit, Plaintiff has reached MMI.

Acceptance of Plaintiff's statements in his Reply Affirmation regarding medical conditions he suffers requires no different result. Those conditions, as described by Plaintiff, include leg numbness, nerve damage and shingles flare-ups. They are absent from any expert physician report, including the two medical expert statements submitted by Plaintiff. No expert has opined that such conditions are being treated with respect to Plaintiff's heart condition. Similarly unsupported by expert testimony is Plaintiff's statement that he has been advised that it is certain that he will develop cancer. The only expert medical opinion that a makes any reference to cancer is Dr. Lima's inclusion of cancer screening as a part of Plaintiff's scheduled follow-up care. Lima Report at 4. This statement refers neither to the existence of cardiac-related, nor any other type, of cancer. It refers only to including such screening as a part of Plaintiff's routinely scheduled follow-up surveillance care. Such surveillance, like all of Plaintiff's follow up care, is properly categorized as maintaining health and preventing relapse - not as continuing cure. Moreover, the failure to include medical expert testimony as to the ailments referred to by Plaintiff in his Reply Affirmation, including cancer, precludes a finding that such conditions show that Plaintiff has not reached MMI, nor even present a question of fact as to their effect on the issue. While Plaintiff can testify as to how he feels, any causal connection to his cardiac issues is a matter that requires medical expert opinions as to cure, of which there are none.

The Court agrees with Defendant that Plaintiff's condition is now analogous to that of an diabetic seaman who requires access to life-saving medications to manage his condition. The Court does not liken the conditions to each other (they are obviously different diseases) and makes no judgments as to whether heart disease is more "serious" than diabetes. However, a seaman who is almost three years post-heart transplant, and whose heart health has recovered to the point of Plaintiff's current condition, is at the same medical stage of MMI as a seaman with well-managed diabetes. In both cases, serious medical conditions have been diagnosed and treated; they are managed to avoid serious adverse medical complications, but neither are subject to further cure. Both patients suffer conditions that are permanent in nature; but both have also achieved MMI.

Finally, while not binding, the parties have agreed that the terms of the Agreement may be considered by this Court when deciding whether Plaintiff has reached MMI. See Agreement at 5(A). The Agreement contemplates the exact medical scenario that is now before the Court. Thus, the parties were aware that the only cure available for Plaintiff's then-dire medical condition was a heart transplant. Additionally, the Agreement foresaw the follow-up treatment that would likely follow Stemmle's transplant. Defendant covered all expenses related thereto, including providing insurance to cover three years of post-operative care.

The terms of the Agreement show an awareness of admiralty law standards for determining the issue of MMI and, in particular, the recognition that MMI can be reached while also managing a chronic illness. Descriptions and references in the Agreement to Plaintiff's post-transplant care are in accord with the expert medical opinions that are before the Court. The Agreement makes specific reference to Stemmle's post-transplant need to follow a closely-monitored regimen of testing, and a continuing course of anti-rejection medication. Further, as

contemplated by the Agreement, and in accord with the opinions of Drs. Kransdorf, Lima and Rich, post-transplant follow-up testing was frequent during the first year following surgery. It was during this period of time when Plaintiff was closely monitored by his transplant team. However, in the two years since the transplant, Stemmle's care has progressed to the point where his follow-up care is less frequent and the testing performed is less invasive. The Agreement's statement that the need for anti-rejection therapy and follow-up visits do not, standing along, preclude a holding that Plaintiff has reached MMI is in accord with the Court's application of the standards of admiralty law.

In sum, the Court finds, based upon all of the factual evidence submitted in connection with the pending motion, that Stemmle's post-transplant condition has now progressed to the point of stability, and no further curative measures are on the horizon. Under these circumstances, Stemmle has achieved MMI. Defendant's responsibility to provide the remedy of cure are at an end. See McMillan, 885 F. Supp. at 461. Accordingly, Defendant's motion for a declaratory judgment is granted.

CONCLUSION

For the foregoing reasons, Defendant's motion for a declaratory judgment, filed on June 6, 2022, and appearing as Docket Entry No. 65 herein is granted. Counsel are to confer and submit an appropriate order and final judgment of notice to effectuate the holding herein. Upon review and approval thereof this matter will be closed.

So Ordered

Dated: Central Islip, New York
         August 8, 2022

 /s/ Anne Y. Shields
         Anne Y. Shields
United States Magistrate Judge